DONALDSON, Judge. '
The Alabama Workers’ Compensation Act, Ala.Code 1975, § 25-5-1 et seq. (“the Act”), establishes the “utilization' review” procedures by which disputes over medical-treatment' plans for injured workers may be resolved. See § 25-5-293(g) and (k), Ala.Code 1975. In this case, Good Hope Contracting Company, Inc. (“Good Hope”), invoked the procedures and conducted a utilization review of medical treatment recommended by an authorized treating physician for Harold W. McCall, a former employee of Good Hope who suffered a work-related injury in 2001. Following the review, Good Hope declined to be responsible for the recommended treatment, and McCall sued Good Hope in the Morgan Circuit Court (“the trial court”). Good Hope appeals from a January 27, 2014, judgment of the trial court finding that the treatment recommended by the physician was reasonable and - necessary and that Good Hope should pay for the treatment. Good Hope also appeals the trial court’s award of attorney fees to McCall for fees incurred in litigation over the recommended medical treatment, which were awarded without a finding of contempt. McCall cross-appeals from the trial court’s judgment insofar as it declines to hold Good Hope in contempt for allegedly failing to properly follow the .utilization-review procedures. We affirm the judgment as to the finding that Good Hope is responsible for the treatment recommended by the physician and as to the determination that Good Hope was not in contempt of court. We reverse that por *1131 tion of the judgment awarding attorney fees to McCall.

Facts

' In its judgment^ the trial court provided a detailed history of the case and set forth its findings of fact and conclusions of law:
“Procedural and Factual History
“1. The Plaintiff, Harold McCall (‘Mr. McCall’) suffered a workers’ compensation injury on or about October 1, 2001. Mr. McCall and Good Hope reached a settlement that was approved by the Court on August 26, 2004 [ (‘the 2004 judgment’)]. Under the terms of the approved settlement, only future medical benefits ‘which are related to [McCall’s] compensable injury, which are reasonable, necessary and aré performed by the authorized medical provider, in accordance with the Worker’s Compensation Act of Alabama’ remained open.
“2. As a result of his injuries to' his neck and his low back, Mr. McCall has undergone at least eight (8) surgeries to his back. These surgeries include a fusion on November 20, 2001 at the C6-7 level of the neck, surgeries and a fusion at the L4-5/L5-S1 levels of the low' back on October 15, [2002], and additional surgeries. The last óf Mr. McCall’s surgeries occurred on April 16, 2012. That surgery was-performed on the L2-3 level of Mr. McCall’s lower back. All of these procedures (approximately 8) were done by an orthopedic spine specialist by the name of Dr. Stan Faulkner, who practices in Birmingham, Alabama.-
“3. In or about June of 2002, Dr. Stan Faulkner referred Mr. McCall 'to Dr. David Cosgrove for the treatment of pain. Dr. David Cosgrove is a pain doctor who practices in Birmingham, Alabama, and who has treated [McCall] for a number of years. Dr. Cosgrove is McCall’s current authorized treating physician for pain management. There is no dispute between the parties regarding the fact that Mr. McCall suffers from chronic pain, and that he is nearly always in a state of pain. ,
“4. Since Mr. McCall was referred to his care, Dr. Cosgrove has provided twenty-one (21) epidural injections to Mr. McCall. The last epidural injection, a lumbar Epidural Steroid Injection (‘ESI’) with fluoroscopy at the midline L3-4 level, took place' on January 7, 2013. On that same date, and contained within his January 7, 2013, ‘Procedure Note,’ Dr. Cosgrove requested another ESI be scheduled in approximately two weeks.
“5. All epidurals must be pre-certi-fied pursuant to Alabama Department of Labor Worker’s Compensation Administrative Code Rule 480-5-5-.02(2)(v). In requesting approval for the follow-up ESI, Dr. Cosgrove submitted. his request for pre-certification through [the] utilization review process [conducted by Millennium. Risk Management, Good Hope’s insurance company].
- • “6. In accordance with the Department of Labor Administrative Rules and Regulations, [Good Hope] has a right to have a utilization review of procedures that are ordered by [McCall]’s treating physician. See Alabama Department of Labor Worker’s Compensation Administrative Code, [Rule] -480-5-5. This right was exercised by [Good Hope].
“7. Pursuant to the administrative regulations, a technical review was performed by the adjuster at Genex Services, the corporation which was assigned to review requested health care services for medical necessity and appropriateness by Millennium Risk [Management], [Good Hope’s] insurance company. •
*1132 “8. Following the technical review, a first level clinical review was performed by nurse Debbie Green, an employee of Genex. It is undisputed that Ms. Green met the requirements for a first level clinical reviewer as specified in Rule 480-5-5-.06(2). Ms. Green did not certify the requested procedure, and pursuant to the administrative regulations, referred the request for a second level clinical review.
“9. The second level clinical review was performed by Dr, Ira Posner, an orthopedic surgeon with a specialty in pain management. .While Dr. Posner is not currently maintaining a clinic-type practice wherein he actively and personally treats patients, he continues the practice of medicine through performance of peer reviews. Dr. Posner’s report is dated January 16, 2013. Dr. Posner recommended non-certification of the L4-5 Transforaminal [ESI], opining that the procedure was ‘medically not necessary or appropriate.’ Dr. Pos-ner’s recommendation was provided in writing to [McCall] and to Dr. Cosgrove.
“10. Following the non-certification' of the procedure, [McCall] filed his Motion To Compel Medical Treatment & For Other Relief. The Motion of [McCall] pertains to the L4-5 transfora-minal [ESI] which was ordered to be performed by Dr. David Cosgrove in or about the end of January 2013, and which was non-certified by Genex.
“Issues and Findings
“1. The first issue of consideration for the Court is whether the treatment ordered by Dr. Cosgrove is reasonable and necessary.
“Ultimately, this case involves the medical care for Harold McCall, a man who has endured at least 8 back surgeries and has come to know pain as a constant companion. There is no objective way to measure the pain that has become part of McCall’s daily life. His pain is discussed with his treating pain doctor, Dr. David Cosgrove, at each office visit.
“[McCall] testified that he has been treated with twenty-one (21) injections since 2004, and that, while some injections work better than others, he gets some measure of relief each time he has an injection — a minimum of 10% relief each time, with as much as 70% relief reported on some, occasions. He also opined that if he doesn’t get injections, ... his life would be terrible. He testified that, since the steroid injections were denied, he has begun to use a cane daily to ease his pain and help with balance. Mr. McCall’s wife testified that she has seen him before and after injections and that she believes he benefits from them. She has seen a decline in his abilities since he has not received an injection.
“Several doctors testified for [Good Hope]. The first was Dr. Ira Posner. Dr. Posner’s capacity in the utilization review was to serve as a level two reviewer, as is defined in the administrative code. Dr. Posner testified that at the time of his review, he had only two progress notes (dated 12/31/12 and 1/7/13) to use in making the determination whether or not to approve the steroid injection that Dr. Cosgrove ordered. He testified that the progress notes with which he was supplied did not give him adequate information to approve the procedure because the notes contained minimal findings. [McCall] has had 8 or more surgeries, and 21 prior epidural injections, and Dr. Posner was not privy to any of that information in the reports he reviewed.
“Dr. Posner testified that he attempted to contact Dr. Cosgrove by phone in *1133 order to obtain more information, but found that Dr. Cosgrove would not take his peer-to-peer call unless a fee was paid. Dr. Posner testified that his goal was to authorize the treatment, but the vague information provided in the records could not support an approval. Further, the treatment notes that were available to Dr. Posner did not support a level of pain relief significant enough to overcome the risk of further injections according to the guidelines. Based on what limited information he had, Dr. Posner found that the procedure was not medically necessary and issued a non-certification recommendation report.
“Ultimately, the Court finds that Dr. Posner had no choice but to non-certify the procedure, given the very limited reports that he had at his disposal. The non-certification report expresses: ‘after careful consideration of the available information by our Physician Advisor, Ira Posner, MD ... the requested treatment has hot been certified.’ (emphasis added)
“Unfortunately, this matter could have come to a quick, and relatively adversarial-free end if Dr. Cosgrove had only taken the call to discuss the non-certification and to notify Dr. Posner of the missing and very important details about Mr. McCall’s history. That 'is, having the additional detail or access to other records might have resulted in an approval of the procedure from the outset. The Court agrees with Dr. Pos-ner’s testimony that the reasonable thing for Dr. Cosgrove to do would have been to provide adequate information so that a decision could have been made without a phone call, but in light of the fact that more information was needed to affirm his decision, Dr. Cosgrove should have taken the call.
“Following the non-certification, the matter was forwarded by Genex to Dr. Brice Brackin for a clinical rationale supporting the non-certification decision made by Dr. Posner.’ Dr. Brackin reviewed a much more comprehensive selection of [McCall’s]' medical records— the clinic and triage notes from January 2010 through January 2013. Dr. Brac-kin reviewed those records in their entirety and determined that the requested ESI procedure was not medically necessary. Dr. Brackin based this recommendation first on his analysis of Mr. McCall’s reported percent of relief. Dr. Brackin testified that Mr. McCall’s relief was quite low — not much higher, in fact, than a placebo would have produced. Further, Dr. Brackin' noted that Mr. McCall had been subjected to more steroid injections than any of their industry guidelines call for, in his opinion. Dr. Brackin concluded that based upon the pain scores, the documentation of relief, and the industry guideline criterion, the additional epidural block was not indicated.
“[Good Hope] produced an expert witness, Dr. Kirit Patel, who is board-certified in anesthesiology and a pain’management diplomat. His credentials are very comparable to those of Dr. Cos-grove. Dr. Patel testified that the transforaminal approach targets a particular nerve. Dr. Patel stated that he would look for other things in the record in order to substantiate the need for the epidural, such as a distribution of pain and other definitive- clinical evidence. He testified that in making a diagnosis, one would have to see certain deficiencies in reflexes and motor sensations and- corroborate those deficiencies with other things. In his review of the records, he looked for documented radiculo-pathy to justify the ordered procedure. He noted that ‘at no time in the chart is there an indication that the patient had *1134 radiculopathic pain in those areas. Further, there is no significant pain relief at any time.’ He went on to say ‘We. don’t know if. the diagnosis is correct or not. It could be right, but there is not enough in. the records to support it. There is nothing here that shows that [the epidurals] are working like they should.’ Dr. Patel testified that based on the records he reviewed in the charts, and not having the benefit of examining the patient, the injection is not medically necessary or reasonable.
“It is undisputed that none, of [Good Hope’s] witnesses ever spoke, directly to Dr. Cosgrove or Mr. McCall. They were all provided with records and reports, pain scores and subjective statements of relief, but none of them actually laid hands on the patient. Dr. Cosgrove’s deposition went into great detail about the criteria that he examines and considers prior to ordering such epidural injections, including a distribution of pain, which is something that Dr. Patel noted would be important in recommending the [ESI]. [In his ■deposition,] Dr. Cosgrove generally detailed several symptoms and causations, and said that it was possible-that Mr. McCall had ‘some or all of those.’ ... However,:-he was unable to specifically recall, which, if any, particular issues or symptoms were being experienced- by Mr. McCall.... Dr. Cosgrove opined that, because an MRI was ordered in September 2012, ... Mr. McCall may have been experiencing anterolisthesis, gross, lumbar fusion changes,- and scar tissue. It is clear that Dr. Cosgrove failed to articulate. any of these findings, ' causations, or symptoms in his progress notes or -elsewhere in Mr. McCall’s file.-,. Dr. Cosgrove’s January 31, 2013, affidavit states ‘it is my opinion, based upon my training, education and experience, as well as my personal examination and . treatment of Mr. McCall, that the treatment that I have prescribed, that is, a L4-5 Transforami-nal Epidural Steroid Injection, is reasonable and medically necessary for the care and treatment of Mr. McCall.’ ...
“None of the reviewing doctors talked to Dr. Cosgrove or McCall — the Court heard from Dr. Cosgrove through his deposition and from McCall directly. McCall testified about the benefits he received from the injections. The fact that the benefits he derived from the injections were not properly documented, such that the ordering of another injection could sustain a review, was not his fault. As Dr. Brackin so adequately stated, ‘you have to see the patient— there is value in that which you can’t get just from reading the record ... the sensation of pain is subjective. As much ’as we test, we can’t feel his pain.’ The Court agrees. The only doctor who is 'intimately familiar with the total spectrum of issues faced by Mr. McCall is Dr. Cosgrove.
“Though the Court places quite a bit of weight on the importance of the doctor-client interactions, the Court is quite concerned that Dr. Cosgrove’s notes are insufficient to sustain .a review by -his .peers. The Court has thoughtfully considered -that though Dr.. Cosgrove was able, in his deposition, to provide various considerations and general criterion that he considers in cases such as Mr. McCall’s, he was unable to provide any testimony to support his opinion that in this particular instance, he specifically considered. It appeared to the Court that he was appallingly unprepared for his deposition and readily admitted that he had not reviewed his file prior to the taking of the deposition. Further, ■ Dr. Cosgrove’s records should' have' been more complete and detailed, such that *1135 they could have sustained this .review in the first place. However, that said, Dr. Cosgrove clearly has the education, training, and experience to evaluate, treat, and prescribe further treatment for Mr. McCall, and is the only person who has been exposed to all of the facets of Mr. McCall’s medical history.
[[Image here]]
“Upon consideration of the testimony and evidence, as well as the weight and credibility to be attributed to the proffered evidence, the Court finds that Mr. McCall has met his burden. He received significant benefits from the epidural injections. While Dr. Cosgrove has failed to properly document the necessary data in order to substantiate the treatments.‘on paper,’ he has the training and experience to order such a procedure and is the only doctor who has personally interacted with Mr. McCall. Therefore, the Court finds that the procedure ordered by Dr. Cosgrove is reasonably and medically necessary.
“2. The Court must consider whether [Good Hope] is in contempt for failing to follow the utilization review process as dictated by the administrative rules.
[[Image here]]
“Though it was not addressed at all in [McCall’s] Motion To Compel Treatment, [McCall] argued during the trial that Good Hope failed to follow the second level utilization review procedure set forth in Alabama Admin. Code (Department of [Labor]) [Rule] 480-5-5-.07(4)(a) because it denied Dr. Cos-grove’s request for pre-certification without first referring the request to a peer for review....
“In this ease, the non-tiertification letter that , was sent to Dr. Cosgrove did not notify Dr. Cosgrove of the allowance for a 48-hour peer review, and. the request was not referred for further review as required in Rule 480-5-5- . .07(4)(a). [Good Hope] contends that this step was not necessary because Dr. Posner was a peer of the ordering physician, Dr. Cosgrove. The issue here is whether Dr. Posner is considered a peer to Dr, Cosgrove, as the procedure to be followed upon Dr. Posner’s non-certification is different depending on whether or not Dr. Posner is Dr. Cosgrove’s peer. McCall argues that Dr. Posner is not Dr; Cosgrove’s peer as defined by Alabama Admin. Code (Department of [Labor]) [Rule] 480-5-5-.02(57). As •such, McCall argues that Dr. Posner and/or Genex were required but failed to satisfy subsections (1) and (2) of Rule 480-5-5-.07(4)(a). Good Hope, on the other hand, argues that Dr. Posner was Dr. Cosgrove’s peer for the purposes of determining when and where an ESI should be administered ■ and therefore ‘ was not 'required' to satisfy subsections (1) and (2) of Rule 480-5-5-.07(4)(a).
“Dr. Posner testified regarding his background and qualifications. ' Dr. Pos-ner' is a board certified orthopedic surgeon. Dr. Cosgrove is a pain doctor that is board certified in anesthesiology. Dr. Posner testified that he would consider himself to be a peer to Dr. Cos-grove in that he can and has performed all of the functions that Dr. Cosgrove performs, and then some. His role as an orthopedic surgeon with a specialty in pain management, he claims, encompasses the role that Dr. Cosgrove ■serves.
“[Good Hope] argues that the procedure in question is not one that is exclusive to anesthesia — that pain management is -multidisciplinary in: nature. [Good Hope] further argue[s] that it is ■not the performance of the procedure that is in question, but the ordering of the treatment in and of itself. Dr. Pos- *1136 ner testified that he has ordered similar procedures many, many times. The Administrative Code itself mentions the interdisciplinary nature of pain management in its definition^ of pain management program. ■ Ala. Admin. Code (Dep’t of [Labor]), Rule 480-5-5-.02(54). The evidence presented at the hearing of this matter indicates that pain management is a broad, multidisciplinary field which includes medical treatment by orthopedic surgeons, anesthesiologists, neurosurgeons, and other medical specialists who are equally qualified to make the decision whether an ESI is medically reasonable and necessary.
“When and where a transforaminal ESI is administered is not a decision exclusive to pain management doctors like Dr. Cosgrove. [McCall] testified that his first ESI administered by Dr. Cosgrove was prescribed, by Dr. Stan Faulkner. Dr. Cosgrove’s deposition confirms this testimony. Like Dr. Faulkner, Dr. Posner is a licensed and practicing physician, board certified in orthopedic surgery. Dr. Posner testified that he ordered numerous trans-foraminal ESIs at the L4-5 and other spinal levels in his clinical orthopedic surgery practice. The evidence shows, and this Court finds, that Dr. Posner is, in fact, Dr. Cosgrove’s peer as defined by Alabama Admin. Codé (Department of [Labor]) [Rule] 480-5-5-.02(57), for the purposes of determining when and where a transforaminal ESI should be administered. Since the Court finds that Dr. Posner was Dr. Cosgrove’s peer, Alabama Admin. Code (Department of [Labor]) [Rule] 480-5-5-.07(4)(a)(l) and (2) have no application in this matter.
“The Court-finds that the'Genex non-certification letter to Dr. Cosgrove issued on January 16, 2013 sufficiently advised Dr. Cosgrove and Mr. McCall of the right to a peer review at the Third Level Utilization Review (UR) stage in accordance with sections (b) and (c) of Alabama Admin. Code (Department of [Labor]) [Rule] 480-5-5-.07(4). That 'letter states:
“ ‘The clinical rationale used in making the non-certification decision will be provided, ⅛ writing, upon request. Please be advised that GE-NEX offers the opportunity for the ' requesting ' provider to discuss the non-certification decision with the Clinical Peer Reviewer making the initial determination, or, with a different Clinical Peer if the original Clinical Peer Reviewer cannot be available within one business day. Requests for peer-to-peer conversations can be made by calling the GENEX toll-free number listed below.
“ ‘If you are not in agreement with this decision, you may file an appeal.’ “The non-certification letter clearly ' states that the non-certification decision was made by a Clinical Peer Reviewer and that the requesting provider had the opportunity to discuss the decision with the Clinical Peer Reviewer who made the decision or another Clinical Peer Reviewer. Dr.' Cosgrove, as Mr. McCall’s authorized treating physician, had the right individually as the medical ■provider or on behalf of his patient, to request that the noncertification be reviewed pursuant to the Third Level Clinical Review process (Peer Clinical Review), or to appeal the non-certification decision. See Alabama Admin. Code (Department of [Labor]) [Rule] 480-5-5-.07(4)(c). Neither McCall nor Dr. Cosgrove appealed or otherwise responded to the non-certification, which would have ultimately resulted in a third level clinical peer review.
*1137 “Accordingly, the Court rejects [McCall’s] theory that [Good Hope] should be held in contempt for failing to follow the second level utilization review procedure set forth in Alabama Admin. Code (Department of [Labor])' [Rule] 480-5-5-.07(4)(a).
“3. The Court must consider whether [Good Hope] should be held in contempt for utilizing the utilization review process and ultimately denying treatment to [McCall] based on the recommendation of Dr. Posner, that is, whether the decision not to authorize payment was a contumacious breach of the standard of care, as [McCall] claims.
[[Image here]]
“In this case, during the utilization review process, Dr. Posner reviewed Dr. Cosgrove’s request for a repeat [ESI]. Although not required to do so, Dr. Pos-ner, during the Second Level Clinical Review, attempted a peer-to-peer telephone conference with Dr. Cosgrove on January 15, 2013. As previously stated, Dr. Posner was informed that Dr. Cos-grove only did peer-to-peer reviews after a fee has been paid to him. After reviewing the very limited selection of Dr. Cosgrove’s procedure and progress notes that were available to him, and after being denied the opportunity to discuss the procedure with Dr. Cos-grove, Dr. Posner determined that the L4-5 transforaminal ESI was not reasonably necessary and therefore, it was non-certified. As stated previously, the Court .believes that Dr. Posner had no other choice, given what limited information was available to him.
“Then, though it was not required to do so, following the non-certification, Ge-nex requested a clinical rationale. -Dr. Brackin thoroughly reviewed Dr. Cos-grove’s medical records from February of 2010 through January of 2013 and Dr. Posner’s’ non-certification. Dr. Brackin provided the Clinical Rationale for non-certification. Under Dr. Bra'ckin’s review, the records kept by Dr. Cosgrove were insufficient to lead to a certification of the procedure. Dr. Brackin indicated that Dr. Cosgrove’s reports did not document a lower extremity dermatome pattern of pain. Without that documentation, there was not enough available information to substantiate the specific transforaminal injection that Dr. Cos-grove ordered. Further, there was not any documentation of sufficient response to the previous injections — either by an activity change (increased functional capacity or returned function), a decrease in medications, or a documented pain alleviation within industry guidelines. Dr. Brackin’s rationale states, and his testimony reflects, that according to McCall’s pain scores, as recorded in Dr. Cosgrove’s medical records, it does not appear that McCall has received any significant lasting benefit from the prior ESIs. However, Dr. Brackin testified that he couldn’t say that those indicators were not present in Mr. McCall, only that they weren’t documented. Dr. Brackin ultimately supported Dr. Pos-ner’s noncertification of the procedure. Like Dr. Cosgrove, the Court finds that Dr. Brackin ultimately could not certify the procedure because the data to support it was not present in the records.
“Under Alabama law, a workers’ compensation insurance carrier denies medical treatment for a work-related injury recommended by an-authorized treating physician without ‘good and valid reasons’ either when it fails to submit the treatment plan to utilization review or when the treatment plan is rejected as medically unnecéssary for reasons other than those established in the foregoing administrative regulations. Ex parte Liberty Mut. Ins. Co,, 92 So.3d 90 (Ala. *1138 Civ.App.2012). There is nothing in-the record to support any conclusion that Good Hope willfully or contumaciously violated any Order of this Court, including the [2004 judgment]. This Court finds that Good Hope exercised, its statutory right to non-certify medical treatment that was not reasonably necessary by appropriately applying the utilization ■ review process. In its application of the UR process, Good Hope was insisting upon its- rights in a legally permissible manner.
“[Good Hope] followed the recommendation of the peer reviewer (Dr. Posner) and the. recommendation of the doctor providing the clinical rationale (Dr. Brackin). The Court finds that. Good Hope had a legitimate, debatable and arguable basis for its non-certification decision and as such cannot .be held in contempt of court.
“4. Finally, the Court must address the .policy arguments of [McCall] made in his post-trial brief regarding the .costs of maintaining the action, (attorneys’ fees, doctors’ fees, ■ deposition fees, etc.)
“In his Post-Trial- Brief, [McCall] ■ presents a policy argument wherein he argues that when a worker’s compensation plaintiff has a .-procedure or treatment that is non-certified via the process of ■ utilization review, 'that the plaintiff often finds himself in a situation where justice is priced out of the ■ [plaintiff’s] reach. [McCall’s] argument stems from the fact that the employee cannot typically file a challenge to a denial of treatment without an attorney, and -that most attorneys are unwilling, to prepare and pursue such ;a claim when there is no statutory mechanism for which they can be compensated for their time and reimbursed their expenses if they prevail. They further argue that the process as a whole causes a ‘wearing down’ ’of claimants — that the act of not providing for lawyers to be paid for their work and ■ time, by statute, allows employers and their insurance companies to virtually eliminate access to the,courts for injured workers. In his Motion To Compel and his Motion To Tax Costs, [McCall] asks the Court to consider an award of attorneys’ fees and the costs of maintaining the action.
“Ultimately, Dr. Cosgrove is [Good Hope’s] doctor, selected by Mr. McCall from a list of approved physicians selected by [Good Hope], It should be noted that, though a plaintiff is not required to exhaust an employer-adopted utilization-review procedure before resorting to the circuit court to vindicate his or her right ■ to reasonably necessary medical treatment (see Ex parte Southeast Alabama Medical Center, 835 So. 2d 1042 at 1054-55 [ (Ala.Civ.App.2002) ]), in Mr. McCall’s case, it may have been beneficial for him to do so. Perhaps taking such an avenue would have prompted coordination between the reviewing doctors and Dr. Cosgrove such that the proper records would have, been reviewed and-the proper discussions had. Doing so could have, and according to testimony, likely would have, resulted in an approval of the treatment during the utilization review process. Dr. Cosgrove failed to properly document the procedures, symptoms, treatments, -and other important items such that a review could be properly sustained. Dr. Cosgrove failed to take a phone call that could have resulted in the certification at the level two review, and Dr. Cosgrove took no action whatsoever as to the non-certification of the procedure. There was no evidence that he.- addressed the non-cer- . tification letter in. any way, either with Genex or Mr. McCall. The Court finds that to be an appalling lack of interest in the appropriate care of Mr. McCall.
*1139 “Pursuant to AIa.Code 1975 § 25-5-89 and § 12-21-144, the ‘taxing of costs [in a worker’s compensation case] is a matter within the trial court’s discretion.’ Ex parte Ellenburg, 627 So.2d [3]98, 400 (Ala.1993), quoting Universal Forest Prods. v. Ellenburg, 627 So.2d 395, 397 (Ala.CivApp.1992). The trial court’s discretion is subject to Ala. R. Civ. P. Rule 54(d), which states: ‘except when express provision therefore is made in a statute, costs shall be allowed as of course to the prevailing party unless the court otherwise directs ...’ Ex parte Gulf States Steel, Inc., 772 So.2d 1122, 1124 (Ala.2000). The Court finds that [McCall], as the prevailing party, is entitled to reimbursement for the costs of maintaining this action. Equity demands it.
“In accordance with the foregoing findings; it is ORDERED/ADJUDGED, and DECREEt) as follows:
[[Image here]]
“2. The transforaminal steroid injection ordered by Dr. Cosgrove is reasonable and medically' necessary. [Good Hope] shall'provide the ordered treatment.
“3. [Good Hope] is not in contempt for failing to properly follow the guidelines of the utilization review process.
“4. [Good Hope] is not in contempt for contumaciously denying treatment to [McCall].
“5. [McCall’s] Motion to Tax Costs is GRANTED. Defendant is taxed with the costs of maintaining this action in the following amounts:
“Deposition, Transcripts and Medical Records of Dr. Cosgrove: $3,490.49
“Filing fees: $273.00
“Attorney’s fees, . Greg Reeves: $11,750.00
“Attorney’s ■ fees, Zach Higgs: $6,625.00
“Expenses: $976.02
“Judgment is entered in the total amount of $23,114.51.”
(Emphasis in original; some emphasis omitted.) The judgment was entered on January 27, 2014. Neither Good Hope nor McCall filed a postjudgment motion to alter, amend, or vacate the judgment pursuant to Rule 59, Ala. R. Civ. P. Good Hope filed á timely notice of appeal to this court on March 7, 2014. On March 10, 2014, McCall filed a cross-appeal to this court. This court granted a consolidated motion filed by the Alabama League of Municipalities Workers’ Compensation Fund a/k/a the Municipal Workers’ Compensation Fund and the Alabama Nursing Home Association Workers’ Compensation Trust Fund a/k/a CareComp for leave to appear as amici curiae in support of Good Hope.
On appeal, Good Hope contends that the trial court erred (1) in concluding that the prescribed epidural steroid injection (“ESI”) 26 was non-certified by Good Hope during the utilization-review process was reasonably necessary and by ordering Good Hope to authorize the procedure and (2) by awarding McCall attorney fees. On cross-appeal, McCall contends that the trial court erred by failing to hold Good Hope in contempt of court for Good Hope’s purported failure to follow the proper utilization-review procedures as provided the Alabama Administrative Code.

Discussion

I,.. Whether the Recommended Treatment Was Reasonably Necessary^
The Act requires an employer to pay for medical treatment that is reasonably necessary for treating an employee’s injury resulting from an accident arising out of and in the course of the employ *1140 ment. Section 25-5-77(a), Ala.Code 1975, provides, in pertinent part:
“In addition to the compensation provided in this article and Article 4 of this chapter, ... the employer,. except as otherwise provided in [the Act], shall pay an amount not to exceed the prevailing rate or maximum schedule of fees as established herein of reasonably necessary medical and surgical treatment and attention, physical rehabilitation, medi- ' cine, medical and surgical . supplies, crutches, artificial members, and other apparatus as the result of an accident arising out of and in the course of the employment, as may be obtained by the injured employee — ”
(Emphasis added.) The employer, has “no obligation to pay for medical treatments that are not ‘reasonably necessary.’” Ex parte Southeast Alabama Med. Ctr., 835 So.2d 1042, 1050 (Ala.Civ.App.2002).
“The standard of appellate review in workers’ compensation cases is governed by § 25-5-81(e), Ala.Code 1975, which provides:
‘“(1) In reviewing the standard of proof set forth herein and other legal issues,, review by the Court, of Civil Appeals shall be without a presumption of correctness.
“ ‘(2) In reviewing pure findings of fact, the finding of.the circuit court shall not be reversed if that finding is supported by substantial evidence.’
“Substantial evidence is ‘ “evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.” ’ Ex parte Trinity Indus., Inc., 680 So.2d 262, 268 (Ala.1996) (quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989)). Addi- ■ - tionally, a trial court’s findings of fact on conflicting evidence are conclusive if they are- supported by substantial evidence. Edwards v. Jesse Stutts, Inc., 655 So.2d 1012 (Ala.Civ.App.1995). ‘This court’s role is not to reweigh the evidence, but to affirm the judgment of the trial court if its findings are supported by substantial evidence and, if so, ■if the correct legal conclusions' are •drawn therefrom.’ Bostrom Seating, Inc. v. Adderhold, 852 So.2d 784, 794 (Ala.Civ.App.2002).”
Denmark v. Industrial Mfg. Specialists, Inc., 98 So.3d 541, 543-44 (Ala.Civ.App. 2012). Good Hope contends that the trial court’s determination that the 22d ESI requested by Dr. David Cosgrove, McCall’s authorized treating physician, was reasonably, necessary was not supported by substantial evidence. Good Hope contends that the trial court relied ón pure speculation based, on mere possibilities to reach the conclusion that the requested ESI was reasonably necessary.
Good Hope first challenges the trial court’s finding that McCall received significant benefits from the first 21 ESIs. Good Hope directs this court to McCall’s testimony that he had not been honest regarding his reports to Dr. Cosgrove concerning his narcotíc-pain-medication úse. McCall was asked to report his pain level on a scale, and' his report'' was referred to as a pain score. Dr. Cosgrove’s medical records for McCall show that McCall reported virtually the same pain scores from December 16, 2011, to June 20, 2013, with no indication that he. had received significant relief from the ESIs he had received during that period. McCall testified that after he received an ESI on January 7, 2013, he experienced a decrease of pain of only “[t]wenty to 25 percent.” According to Dr. Ira Posner and Dr. Brice Bracken, the doctors who conducted the utilization review, a 20% to 25% improvement in *1141 McCall’s condition after an ESI would not be enough response to justify another ESI. Dr. Posner, Dr. Brackin, and Dr. Kirin Patel, an expert witness for Good Hope, testified that McCall’s improvement level did not exceed the 30% mark used to distinguish relief from a placebo effect. Dr. Brackin testified that if a patient does not get relief of 50% or more from the ESIs and if the duration of the relief from the treatment does not last six to eight weeks or longer, then an additional ESI would not be medically necessary. Dr. Patel testified that, after reviewing Dr. Cosgrove’s medical records for McCall, he believed that there would be no definitive benefit derived from the 22d ESI and that continuing to provide injections would be “risky” to McCall. ■ . • ■
McCall testified that he received a significant benefit from the ESIs. McCall testified that he received more pain relief from some ESIs than from others. He testified that, since the ESIs .had stopped, he had experienced “a lot of pain” in his lower back and down his left leg and that the pain “gets worse with time.” He testified that he had to rely on a cane to ease his pain and to assist with his balance. He testified that he did not take his prescribed pain medication when he drove a car, including when he drove to Dr. Cos-grove’s office for appointments. He testified that he was compliant with the prescribed medication regimen when he was at home. McCall stated that he requires several ESIs, often within a short period, to obtain maximum pain relief. Betty McCall, McCall’s wife, testified that McCall benefited from the ESIs. She stated that his condition had deteriorated since he last received an ESI.
Although' some of Dr. Cosgrove’s medical records indicate that McCall received only 20% tó 25% pain-score improvement after ESIs, the records also show that McCall’s pain had, on occasion, decreased by 50% to 70% after an ESI. Furthermore, a factor the trial court apparently weighed heavily in favor of McCall’s motion to compel Good Hope to provide the treatment is that only Dr. Cosgrove had examined and treated McCall, and, the trial court noted, Dr. Cosgrove.testified that the.22d ESI was medically necessary to reduce the pain McCall was experiencing, and “to provide a good environment for healing.” Dr. Cos-grove testified that patients like McCall may require multiple ESIs to achieve a good clinical response. He further testified that the 22d ESI was medically necessary to prevent further, deterioration in the area surrounding McCall’s nerve root.
Based on our review of the conflicting evidence in the record, we conclude that McCall presented substantial evidence from which the trial court could have found that the additional ESI was reasonably necessary. Thus, we cannot conclude that the judgment ordering Good Hope to provide the treatment is due to be reversed.
II, Contempt
McCall contends in his cross-appeal that the trial court erred by failing to find that Good Hope was in contempt of the August 24, 2004, judgment (“the 2004 judgment”) by failing to follow the utilizar tion-review procedure set out in the Act and in regulations promulgated by the Department of Labor, Workers’ Compensation Division, in Chapter 480-5-5 of the Alabama Administrative Code. Specifically, McCall contends that his request for treatment was not reviewed by a peer of Dr. Cosgrove, his- authorized treating physician, as required by Rule 480-5-5-.07(4), Ala. Admin. Code (Alabama Department of Labor), and that, by not following the proper utilization-review procedures, Good Hope willfully and contumaciously refused *1142 to provide McCall reasonably necessary medical treatment.
“Rule 70A, Ala. R. Civ. P., governs contempt proceedings that arise out of civil actions. Civil contempt is defined by that rule as the !willful, continuing failure or refusal of any person to comply with a court’s lawful writ, subpoena, process, order, rule, or command that by its nature is still capable of being complied- with.’ Rule 70A(a)(2)(D), Ala. R. Civ. P. (emphasis added). Oür Supreme Court, in Travelers Indemnity Co. of Illinois v. Griner, 809 So.2d 808, 814 (Ala,2001), characterized its decision 10 years earlier in Ex parte Cowgill, 587 So.2d 1002 (Ala.1991), as holding ‘that the [trial] court, in the exercise of its equitable powers, could hold a party in contempt upon a finding that “the employer willfully and contumaciously refused” ’ to follow the trial coürt’s order.”
Overnite Transp. Co. v. McDuffie, 933 So.2d 1092, 1099-1100 (Ala.Civ.App.2005). “The issue whether to hold a party in contempt is solely within the discretion of the trial court, and a trial court’s contempt determination will not be reversed on appeal absent a showing that the trial court acted, outside its discretion or that its judgment is not supported by the evidence.” Poh v. Poh, 64 So.3d 49, 61 (Ala.Civ.App. 2010) (citing Brown v. Brown, 960 So.2d 712, 716 (Ala.Civ.App.2006)).
As the trial court noted, the 2004 judgment- required Good Hope to pay for McCall’s reasonable and necessary medical treatments related to his compensable injury rendered by authorized medical-care providers. Good Hope' was not required by the 2004 judgment to pay for medical treatment that was not reasonable and necessary. An employer is not required to invoke the utilization-review-process provided in the Act to resolve a disputed issue regarding the reasonableness or necessity of medical treatment, but it may choose to do so. Ex parte Southeast Alabama Med. Ctr., 835 So.2d at 1061. Good Hope was not required by the 2004 judgment to comply with the utilization-review process, but it was required to pay for medical treatment that met the criteria listed in the judgment. McCall argues that once Good Hope chose to invoke the utilization-review process, it was bound to properly follow that process and was subject to being held in contempt for failing to do so. For purposes of our analysis, we will re-cast the issue of contempt as presented to a claim by McCall that Good Hope was in contempt for failing to pay for medical treatment and Good Hope’s raising compliance with the utilization-review process as a defense to the allegation of contempt.
In James River Corp. v. Bolton, 14 So.3d 868 (Ala.Civ.App.2008), this court summarized the utilization-review process:
“If -an employer questions the necessity and reasonableness of an employee’s medical treatment,' the employer may seek to review the employee’s medical treatment following a process established in regulations promulgated by the Alabama Department of [Labor], Workers’ Compensation Division,' and set • forth in Chapter 480-5-5 of the Alabama Administrative Code. The - scope of Chapter 480-5-5 is stated in Ala. Admin. Code, r. 480-5-5-.01, as follows:
“‘These rules are designed to cover permissive bill screening and permissive utilization review undertaken on behalf of an employer by a person Or entity other than an employee' of the employer and following a determination that an employee has suffered an injury by accident arising out of and .• in the course of the employee’s employment. These rules are not to be interpreted as limiting the employer’s own prerogative.’
*1143 “Chapter 480-5-5 sets forth, among other things, two processes by which an employer may review an employee’s medical treatment: precertification review and utilization review. ‘Precertifi-cation review is defined in Chapter 480-5-5 as ‘[t]he review and assessment of the medical necessity and appropriateness of services before they occur. The appropriateness of the site or level of care is assessed along with the timing, duration and cost effectiveness of the proposed services.’ Ala. Admin. Code, r. 480-5-5-.02(60)(emphasis added). ‘Utilization review is defined in Chapter 480-5-5 as ‘[t]he determination of medical necessity for medical and surgical in-hospital, outpatient, and alternative setting treatments for acute and rehabilitation care. It includes pre-certification for elective. treatments.’ Ala. Admin. Code, r. 480-5~5-.02(68). ,
“Rule 480-5-5-.07 of the Alabama Administrative Code sets forth the utilization-review process. Pursuant, to that rule, utilization review begins with the review of an employee’s medical records by a technical reviewer, see Ala. Admin. Code, r. 480-5-5-07(2), followed by a first-level clinical review, see Alá. Admin. Code, r. 480-5-5-.07(3), and a second-level clinical review, see Ala. Admin. Code, r. 480-5-5-.07(4). If the second-level clinical review leads to a decision by the employer to deny payment of medical expenses, ‘[t]he claimant may request through the ordering provider that a Third Level Clinical Review be conducted.’ Ala. Admin. Code, r. 480-5-5-.07(6). The attending physician or other ordering provider may also request on his or her own initiative a third-level clinical review of a noncertifi-cation or denial of payment for medical services following a second-level clinical review. See Ala. Admin. Code, r. 480- ■ 5-5-.07(4)(c). The third-level clinical-review process ‘shall be initiated by the provider contacting the [utilization-review entity] or employer/agent by telephone or other immediate means following receipt of the decision to be followed by a written request that shall include medical records and/or data needed to reach a decision.’ Ala. Admin. Code, r. 480-5-5-.23(l)(a)2. If a provider believes that a determination not to certify a medical service made prior to or during an ongoing service requiring review warrants reconsideration, the provider may initiate. an expedited appeal, see Ala. Admin. Code, r. 480-5-5-,07(5)(a), or, if an immediate appeal is not necessary, the provider may initiate a standard appeal, see Ala. Admin. Code, r. 480-5-5-.07(5)(b).
“Rule 480-5-5-.09 of the Alabama , Administrative Code sets forth the pro- . cedure for precertification review. Pursuant to subsection (2) of that rule, the employee’s physician, the hospital, or other provider shall initiate the precerti-fication process by .contacting the employer or the employer’s agent in advance of treatment or admission into the hospital. If the requested treatment or admission is denied, :
“ ‘[a] response shall be generated in writing_Copies of the written response, if required, shall be sent to the requesting provider and shall notify the party of the right to appeal and the appeal process. The denial letter shall contain the following elements: claimant’s.name, social security number and addresses; date of accident; date of requested service; procedure requested; name of provider or facility; .reason for denial; and the appeals process. The claimant shall be copied on all denial letters.’
“Ala. Admin. Code, r. 480-5-5-.09(8).
*1144 “5 ‘Providers’ are defined as ‘[a] medical clinic, pharmacist, dentist, chiropractor, psychologist, podiatrist, physical therapist, pharmaceutical supply company, rehabilitation service, other person or entity providing treatment, service, or equipment, or person or entity of providing facilities at which the employee receives treatment.’ Ala. Admin. Code, r. 480-5-5-.02(62).”
14 So,3d at 872-73. ■
■ McCall argues that Good Hope failed to comply with the utilization-review procedures' by not having the second-level review completed by a peer of Dr. Cosgrove and/or by failing to have the requested treatment submitted to the third-level review by a peer of Dr. Cosgrove within 48 hours of the notification to Dr. Cosgrove that the treátment had been denied by the second-level reviewer. According to Rule 480-5-5-.06(3), Ala. Admin. Code (Alabama Department of Labor), the second-level reviewer must meet certain qualifications:
“(a) Physicians or medical directors who directly support the utilization review activity of and employer/agent or [Utilization Review Entity] shall perform second level clinical review. In addition to the qualifications of Rule 480-5-5-.05, physicians or medical directors performing second level review shall:
“1. Hold a current nonrestricted license to practice medicine or a health profession in the United States;
“2. Be oriented to the principles and procedures of utilization review, peer review and these rules;
“3.' Review cases in which a clinical determination to certify cannot be made by the first level clinical reviewer; and
“4. Review all cases in which the utilization review process has concluded that a determination not to certify for clinical reasons is appropriate.”
If the second-level reviewing physician is not a peer of the physician recommending the treatment under review, Rule 480-5 — 5—.07(4), Ala. Admin. Code (Alabama Department of Labor), provides a procedure for additional review:
“(a) If the physician performing the second level clinical review is not a peer to the ordering physician and a decision to approve the request cannot be rendered, the second level clinical reviewer shall:
“1. Notify the requesting provider that up to 48 hours will be allowed for the purpose of a review by the requesting provider’s peer, and
“2. Refer the request for a review by the requesting provider’s peer.
“(b) The physician or medical director ' performing second level clinical review shall be reasonably available (within one business day) by telephone or in person to discuss the determination with the attending physician and/or other ordering providers.
“(c) Upon request by the attending physician or other ordering provider, a non-certification or denial of payment for medical services pursuant to the Second Level Clinical Review process shall be reviewed pursuant to the Peer Clinical Review (Third Level Clinical Review) process. The Third Level Clinical Reviewer shall not be the same peer that rendered a denial or adverse determination at the Second Level Clinical Review.”
The term “peer” is defined in the pertinent part of the Alabama Administrative Code as
“[a] provider who is board certified in the same or similar specialty approved by the American Board of Medical Spe *1145 cialists for Physicians or the Advisoiy Board of Osteopathic Specialists for Osteopaths from the major areas of clinical services or a physician who normally treats that type of case as the ordering provider whose medical services are being reviewed, or for non-physician clinical peers, the recognized professional board for their specialty.”
Rule 480-5-5-.02(57), Ala. Admin. Code (Alabama Department of Labor).
McCall argues that the trial court erred in concluding that Dr. Posner, the second-level reviewer, was a peer of Dr. Cosgrove and that, accordingly, the trial court erred in determining that the additional review process set out in Rule 480 — 6—5—.07(4)(a)(1) and (2) were not applicable to Good Hope following Dr. Posner’s recommendation to deny the request for treatment. McCall contends that Dr. Posner is not certified in the same or a similar specialty as Dr. Cosgrove and that Dr. Posner does not “normally treat” the types of injuries treated by Dr. Cosgrove. McCall points out that Dr. Cosgrove is a pain specialist with a board certification in anesthesiology and that he holds credentials pertaining to pain management from the American Academy of Pain Management. McCall argues that Dr. Posner, on the other hand, is a retired ’ orthopedic surgeon with no certifications in pain management. McCall further directs this court to evidence indicating that Dr. Posner has never performed a transforaminal ESI, the procedure recommended by Dr. Cosgrove. Accordingly, McCall contends that, because the evidence does not support a conclusion that Dr. Posner was a peer of Dr. Cosgrove as that term is defined by Rule 480-5-5-.02(57), Good Hope should have sent the request for treatment for a peer review after Dr. Posner provided his recommendation to deny the request for treatment.
In support of his argument, McCall analogizes the term “peer” as it appears in the Alabama Administrative Code with the definition of a “similarly situated health care provider” in the Alabama Medical Liability Act (“AMLA”),' § 6-5-480 et seq. and § 6-5-540 et se'q., Ala.Code 1975; specifically § 6 — 5—548(c), Ala.Code 1975, defines a “similarly situated health care provider,” with respect to a medical specialist, as a person who:
“(1) Is licensed by the appropriate regulatory board or agency of this or • some other state.
“(2) Is trained and experienced in the same specialty.
“(3) Is certified by an appropriate ' American board in the same specialty.
“(4) Has practiced in this specialty during the year preceding the date that the alleged breach of the standard of care occurred.”
The purpose of § 6-5-548 is “to establish a relative standard of care for health care providers.” § 6-5-548(e). The purpose of the utilization-review process established under the Act is to assist an employer in determining whether it is obligated to pay for recommended medical treatment. ■ The Act does not contain, a requirement that peer review be. conducted by a “similarly situated health care provider,”, and the judiciary cannot superimpose such a requirement onto the legislatively created utilization-review process. Therefore, the question whether Dr. Posner is a peer of Dr. Cosgrove is not determined by a reference to the AMLA.
Good Hope contends that the trial court based its finding that Dr. Posner qualified as a peer of Dr. Cosgrove on substantial evidence. Good Hope contends that Dr. Posner is an orthopedic surgeon with a subspecialty in pain management, that he is board certified in orthopedic *1146 surgery by the American Board of Ortho-paedic Surgery, that he had once served as director of a chronic-pain clinic, and that he had seen hundreds of patients with chronic-pain syndrome. He testified under questioning from the trial court:
“I’m a board certified orthopedic surgeon. We treat everything in the lumbar spine that the anesthesia person will treat and then some. In other words, we can do everything he can do. If not do it ourselves, order it certainly. And . knowing it. should be done as well as operate on the spine, which he won’t. .So our speciality actually encompasses larger than [Dr. Cosgrove’s], So being ‘the same or similar’ I would argue that is certainly similar, if not more encompassing as his.”
Dr. Posner further testified that he had treated many patients who required ESIs and that, in his current capacity working in utilization review, he has reviewed thousands of similar cases per year to determine' whether ESIs are appropriate. Good Hope also points out that the interdisciplinary nature of pain management is noted in'the Alabama Administrative Code, which defines a “pain management program” as “[a] program to reduce pain, improve function and decrease the- dependence on the health care system by persons with chronic pain that interferes with physical, psychosocial and vocational functioning through the provision of coordinated, goal oriented, interdisciplinary team services.” Rule 480-5-5-.02(54). Similarly, Good Hope introduced into evidence the definition of pain management'established by the American Board of Anesthesiology in its Booklet of Information (1995):
“4.1 DEFINITION OF PAIN MANr - AGEMENT
“Pain management is the medical discipline concerned with the diagnosis and treatment of the entire range of painful disorder. Because of the vast scope of the field, pain management is often considered a multidisciplinary subspecialty. The expertise of several disciplines is brought together in an effort to provide . the maximum benefit to each patient. Although the care of patients is heavily influenced by the primary specialty of physicians who subspecialize in pain management, each member of the pain treatment team understands the anatomical and physiological basis of pain perception, the psychological factors that modify the pain experience, and the basic principles of pain management.”
Dr. Patel, a board-certified anesthesiologist, testified under examination by Good Hope’s counsel:
“Q. Tell me about pain management as a practice area. Is it something that is restricted to a particular — one single board?
“A. ' Oh, no. Oh, no. It is a multis-pecialty, practiced mostly on the — the pain management is done primarily done Joy the anesthesiologist. They will do . certain procedure. The coordinators [of] care were other professions, orthopedic surgeons, neurologists, pediatrists, physical therapists and so on.
“Q. ... Orthopedic surgeons coordinate with the pain management that an anesthesiologist would be provided?
. “A. Yes, sir. Typically a pain clinic . is one that is headed by an anesthesiolo.gist. All the physicians are certified in the pain management, and then he will coordinate the patient’s care, depending on the diagnosis with the neurologist, neurosurgeons, or orthopedic surgeon, psychiatrist, physical therapist.
[[Image here]]
“Q. Do some of the practice areas of anesthesiologist overlap with some' of the practice areas- of other medical spe-cialities that you just—
*1147 “A. Very much so, yes.
[[Image here]]
“Q. Would it be a fair statement that an orthopedic surgeon is an appropriate medical speciality to determine when and where an epidural steroid, injection, like a.transforaminal at the L-4-5 level should be administered?
“A. Yes.
“Q. And the medical condition for which that treatment would be appropriate?
“A. Yes.”
Dr. Patel also testified that he had p'er-formed hundreds, of L4-5 transferaminal ESIs, a majority of which were performed on patients referred to him by orthopedic surgeons.
Dr. Brackin, an orthopedic surgeon, testified that, although an anesthesiologist and an orthopedic surgeon may have board certifications in different specialties, those specialties overlap when the same condition is treated. In response to a question from the trial court concerning whether he considered himself to be a peer of Dr. Cosgrove, Dr. Brackin stated:
“I think that in the field of medicine treatment of pain overlaps, and basically if you — like I did practice a lot of spine surgery, which involved similar pain, and we both treated the same type pain, similar pain conditions, and I think that prescribed for it, I think that would constitute a peer.’’,
The trial court had before it substantial evidence from which it could have properly concluded that Dr. Posner qualified to serve as a “peer” of Dr. Cosgrove in relation to Dr. Cosgrove’s recommendation for a 22d ESI for McCall. - Our conclusion that Dr. Posner could be construed as a peer of Dr. Cosgrove negates McCall’s argument -.that Good Hope contumaciously violated the utilization-review procedures by not referring the matter to a third-level peer review -pursuant to Rule 480-5-5-.07(4)(a). Consequently, Good Hope could not be found to be in contempt of the 2004 judgment as the contempt claim was presented and argued by the parties.
■' III.- Attorney Fees
Pursuant to the January 27, 2014, judgment, the trial court awarded McCall attorney fees in the amount of $18,375. Good Hope contends that the trial court had no basis to award attorney fees to McCall without a finding of contempt against Good Hope. In Ex parte Cowgill, 587 So.2d 1002 (Ala.1991), our supreme court stated:
“It is .well settled that attorney fees are recoverable only where authorized by statute; when provided in a contract; or in certain equitable proceedings when the interests .of justice so require, as in the case when the opposing party has, acted in bad faith. See Reynolds v. First Alabanza Bank of Montgomery, N.A., 471 So.2d 1238 (Ala.1985), for an in-depth discussion of the exception to the ‘American rule’ of awarding attorney fees. In.the instant case,, as the trial court held and as the Court of Civil Appeals held, there is no provision-in the Act that allows an award of attorney fees under the circumstances before us, nor is there a contract that provides for such fees. Therefore, if we were to , allow such an award, we would have to do. so by invoking the equitable jurisdiction of the court so as to effectuate the • beneficent purpose of the Act, which ■ should be liberally construed in favor, of the employee. In the exercise of our equitable powers, we would look to the acts of .the employer to determine whether the employer was justified in refusing the payment of the requested medical and surgical expenses or whether its refusal to pay was done in bad *1148 faith — i.e., whether the employer willfully and contumaciously refused to provide the expenses for the medical care necessarily and directly related to the on-the-job injury. If the actions of the employer evinced bad faith, then we would be inclined to exercise our equitable powers and, thus, utilizing our policy-making function, probably would be inclined to assess attorney fees against the employer for those bad acts. However, in this case, the trial court found that Bowman’s dispute with Cowgill as to the requested expenses was asserted in good faith; and that finding is not in dispute. Therefore, under these circumstances, we could not equitably require the employer to pay the attorney fees incurred to settle the dispute.”
587 So.2d at 1003-04. In Argo Construction Co. v. Rich, 603 So.2d 1078 (Ala.Civ. App.1992), this court determined that an employer’s willful and contumacious refusal to pay the reasonable and necessary medical expenses of an injured employee supported the employee’s bringing a contempt action and that the trial court was allowed to assess attorney fees when-the employer was found to have been in contempt of court.
In the present case, there is no contract between' McCall and Good Hope providing for attorney fees for obtaining the ESI procedure. The evidence supports the trial court’s conclusion that “Good Hope had a legitimate, debatable and arguable basis for its non-certification decision and as such cannot be held in contempt of court.” Because the trial court determined that Good Hope was not in contempt, there was no authority under current law for the trial court to order Good Hope to pay McCall’s attorney fees. See Southern Label Co. v. Raymond, 707 So.2d 280 (Ala.Civ.App. 1997). Accordingly, we reverse the trial court’s judgment to the extent it awarded $18,375 in attorney fees to McCall.

Conclusion

For the foregoing reasons, we affirm the trial court’s judgment in the cross-appeal filed by McCall as to its determination that Good Hope was not in contempt. In the appeal filed by Good Hope, we affirm the trial'court’s judgment as to its determination that the 22d ESI is reasonably necessary. We reverse the trial court’s judgment to the extent that it awarded McCall attorney fees in the amount of $18,375, and, accordingly, we instruct the trial court to vacate that portion of the judgment.
APPEAL — AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
CROSS-APPEAL — AFFIRMED.
THOMPSON, P.J., and PITTMAN, THOMAS, and MOORE, JJ., concur.